[Crim. No. 20980. First Dist., Div. One. May 6, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES VARLEY YECKLEY, Defendant and Appellant.

**COUNSEL**

Alan G. Rodier, under appointment by the Court of Appeal, Quin Denvir, State Public Defender, Harriet Wiss Hirsch and Kathleen Kahn, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Herbert F. Wilkinson and Paul D. Gifford, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ELKINGTON, Acting P. J.**—Defendant James Varley Yeckley was charged in the superior court with having committed the following crimes:

Count one: Assault, May 24, 1979, upon Michael T. Keegan with intent to commit murder (Pen. Code, § 217).

Count two: Assault, May 24, 1979, upon Michael T. Keegan, with a deadly weapon or by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)).

Count three: Murder, June 21, 1979, of Thomas Gizzi (Pen. Code, § 187).

Count four: Assault, May 26, 1979, upon Elias Mora by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)).

Count five: Battery, July 9, 1979, on a peace officer, Gary Goulart (Pen. Code, §§ 242-243).

To each of the charges Yeckley pleaded "not guilty" and "not guilty by reason of insanity." (See Pen. Code, § 1016.)

On the "not guilty" phase of his bifurcated trial a jury found him guilty of all of the charges, and the degree of the murder charged in count three was fixed at second degree. At the subsequent trial on the issues of "not guilty by reason of insanity," he was found "insane" as to counts one, two, three and four, and "sane" as to count five.

As to counts one, two, three and four Yeckley was committed to Atascadero State Hospital under Penal Code section 1026, with a maximum term of commitment for life, according to Penal Code section 1026.5. On the count five conviction he was sentenced to state prison for a term of two years, with execution of the sentence stayed until such time as his sanity might be restored.

The appeal is from the "judgment," which we interpret as from the judgment as to count five, and from the commitment to Atascadero

State Hospital as to the remaining counts. (See Pen. Code, § 1237, subd. 1.)

■ On the appeal Yeckley makes but two contentions.

The first is that the jury's finding that he was guilty of the second degree murder of Thomas Gizzi as charged in count three was unsupported by substantial evidence.

At the trial of the issues joined by Yeckley's not guilty plea to count three's charge of murder he was "conclusively presumed to have been sane" at the time of its alleged commission. (Pen. Code, § 1026, subd. (a).) Relevant to that charge is the trial's following evidence which the jury reasonably could, and presumably did, find to be true. (See *People v. Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468]; *Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784-785 [59 Cal.Rptr. 141, 427 P.2d 805].)

Following his arrest for the aggravated assaults charged in counts one and two, Yeckley was detained in the county jail. His assigned cellmate was one Elias Mora. On May 26, 1979, for "no reason," Yeckley grabbed Mora, pulled him to the floor and endeavored to strangle him. Failing in that purpose and as testified by Mora, Yeckley started "jumping on me and jumping on me, and, you know, continue jumping on me." Serious injury resulted to Mora, and the incident led to the here unchallenged jury finding of Yeckley's guilt of "assault by means of force likely to produce great bodily injury" under count four.

About four weeks later, June 21, 1979, a jail inmate heard cries for help from an adjoining cell occupied by Yeckley and one Thomas Gizzi. The pleas were followed by a "gasping sound," like "choking," and "thumping sounds." Then "Everybody just started hollering 'man down.'" Sheriff's officers rushing to the scene observed Gizzi lying on his back and unconscious, with Yeckley "standing over him." Gizzi's eyes were partially open, blood was running down the side of his mouth, and Yeckley was straddling him. "Mr. Gizzi's body was between Mr. Yeckley's legs . . . ." No other person was in the cell.

Gizzi died from his injuries which, among other things, consisted of a fractured skull, extensive hemorrhages and contusions of the brain, and a fractured rib cage.

The foregoing, in our opinion, constituted substantial evidence supportive of the jury's verdict of Yeckley's guilt of the second degree murder of Gizzi. "It is settled that the necessary element of malice may be inferred from the circumstances of the homicide." (*People* v. *Lines* (1975) 13 Cal.3d 500, 505 [119 Cal.Rptr. 225, 531 P.2d 793].)

The appeal's remaining contention may reasonably be narrowed to an argument that because of the jury's findings that Yeckley was insane at the times of their alleged commission he was, as a matter of law, unable to entertain the *specific intent* required on count one's charge of assault with intent to commit murder, and the *malice* essential to conviction on count three's charge of murder.

It is urged that as to those offenses, "the convictions" be "reversed" or, alternatively, that the verdicts be modified, under Penal Code section 1181, subdivision 6, to establish guilt of lesser included offenses not requiring the mental states, respectively, of "specific intent" and "malice." Implicit, indeed explicit, is an argument that Yeckley was somehow convicted of, and his punishment ordered for, the crimes instantly at issue.

Yeckley misconceives the purpose and effect of the statutes relating to pleas, and findings, of not guilty by reason of insanity pursuant to Penal Code sections 1026-1026.5.

These statutes initially provide for separate trials of the issues joined on pleas of not guilty and not guilty by reason of insanity. Upon both such pleas "the defendant shall first be tried as if only [the not guilty plea] had been entered, and in such trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed." At that trial the jury will sometimes find the defendant "guilty" of the charged crime. But although in appearance a determination of guilt of crime, such a verdict is nevertheless provisional and incomplete. For its validity requires a subsequent jury finding that the defendant was sane at the time of the alleged crime's commission. Upon the jury's contrary finding that he was insane at such time the earlier guilty verdict loses its vitality and the defendant, not being subject to punishment has, in legal and practical effect, committed no crime. (See Pen. Code, § 15, and generally, § 1026, subd. (a).)

However, at that point the defendant, having been adjudged insane while committing an act otherwise criminal, at least presumably poses a threat to the personal security of others. The public welfare requires reasonable protection against the probability of further violence. The statute therefore provides, upon such a finding, for commitment for care and treatment to a state hospital, "unless it shall appear to the court that the sanity of the defendant has been recovered fully, . . ." (See generally Pen. Code, § 1026, subd. (a).)

Upon the defendant's commitment as insane to a state hospital he will be released upon judicial or other proper determination that his sanity has been restored. (Pen. Code, §§ 1026.1, 1026.2.) And his commitment as insane under the penal statutes, regardless of whether he shall have recovered his sanity, may not be continued beyond the maximum period of time for which he might have been sentenced had he been found sane and responsible for his crime. (See Pen. Code, §§ 1026.1, 1026.5; *People v. Feagley* (1975) 14 Cal.3d 338, 359 [121 Cal.Rptr. 509, 535 P.2d 373].)

It will thus be seen that our law, we think wisely, provides that one found insane and therefore not responsible for his otherwise criminal acts shall, at least ordinarily, remain in hospital custody so long as his insanity continues and he poses a threat to the public. "'Such a commitment is not for the punishment of such a defendant, for there can be no punishment for him who has been acquitted, but it is for the protection of the public, made in the exercise of the police power of the state, which permits the restraint of an insane person who at large would be a danger to the peace and safety of the people. . . .'" (*In re Slayback* (1930) 209 Cal. 480, 488 [288 P. 769].)

■ It will thus be seen that Yeckley was neither convicted of, nor is he being punished for, the crimes of assault with intent to commit murder (count one), or murder (count three). Nor does his commitment to a state hospital depend to any degree upon the jury's finding of "specific intent" or "malice." Those findings, establishing "guilt," were effectively invalidated upon the jury's subsequent "insanity" verdicts, and are now wholly irrelevant to Yeckley's appeal.

Instead, as one who has demonstrated a propensity of violence toward others while insane, he has been committed to a state hospital until such time as his sanity shall have been restored, and not beyond the maximum time for which he might have been sentenced for his violent

acts had he been sane when they were committed. Such a commitment has been characterized as a *duty* of the state which becomes "'urgent and pressing when it is proven that such person is not only insane, but has developed criminal tendencies as a result of his mental derangement which has caused him to take the life of a human being under circumstances which, but for his mental state, would amount to murder. In endeavoring to perform this duty of caring for those who are mentally afflicted and of *protecting the public* from injury by those insane persons who have been proven to possess criminal tendencies . . .' ([italics] added), the Legislature enacted the pertinent sections of the Penal Code." (*Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247, 253 [28 Cal.Rptr. 718, 379 P.2d 22].)

And, in such cases, ""'reasonable medical doubts and reasonable judicial doubts [must] be resolved in favor of the public.""" (*In re Franklin* (1972) 7 Cal.3d 126, 147 [101 Cal.Rptr. 553, 496 P.2d 465].)

We observe that Yeckley has made no contention of error in respect of his state hospital commitment under counts two and four, or the judgment of conviction entered as to count five.

The commitment to Atascadero State Hospital as to counts one, two, three and four, and the judgment of conviction as to count five, are, and each is, affirmed.

Newsom, J., and Grodin, J., concurred.

A petition for a rehearing was denied June 5, 1981, and appellant's petition for a hearing by the Supreme Court was denied July 1, 1981.