Filed 11/25/13  P. v. O'Rourke CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRENDAN LIAM O'ROURKE,<br><br>    Defendant and Appellant. | D062132<br><br><br><br>(Super. Ct. No. SCN283429) |


APPEAL from a judgment of the Superior Court of San Diego County, Aaron Katz, Judge.  Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

Brendan Liam O'Rourke, who suffers from a mental illness causing delusions, opened fire at an elementary school.  At the guilt phase of his trial, the jury found him guilty of numerous counts of premeditated attempted murder and other offenses.

Defendant raises no challenges to the guilt phase verdict. At the sanity phase of his trial, the jury rejected his claim of not guilty by reason of insanity. On appeal, he argues the record does not support the jury's sanity phase verdict. We reject this contention and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Guilt Phase*

On October 8, 2010, defendant went to an elementary school during the lunch recess when there were many children on the playground. He had a gun in one hand and a gas can in his other hand. As he walked across the playground, defendant said "This is just a drill. These are not real bullets." He then started shooting at the children. As the children ran away from him, he chased them and continued shooting at them. When a noon duty employee confronted him, he pointed the gun at her and she heard it click. When the gun did not fire, defendant put down the gas can and tried to reload the gun. School employees continued to direct children to run to safety into classrooms. When a campus monitor approached defendant and asked, "What the hell are you doing?" defendant responded, " 'This is a drill, and these are blanks.' "

Several construction workers at the school intervened in the incident. Defendant was still trying to reload his weapon, and the workers were trying to corner him and yelling at him to stop and put the gun down. Defendant aimed the gun at the workers and moved towards them. A worker heard the gun click. Another worker was moving crying children inside the jobsite to get them away from defendant. Defendant starting running away across a field; he continued trying to load his gun as he was being chased by the

2

construction workers. Defendant exited the playground by climbing over a fence, and went towards his vehicle. Meanwhile, a construction worker ran to his truck, drove by defendant's vehicle, and told defendant to stop and put the gun down. When defendant pointed his gun at the construction worker, the worker ran into defendant with his truck. The workers kicked and hit defendant, grabbed the gun, and held defendant until the police arrived.

Defendant had ammunition and a gun speedloader in his jacket pockets. There was a propane tank on the sidewalk by defendant's vehicle. Defendant's gas can, along with long matches, were found on the school grounds. An FBI bomb technician testified that a gas can, matches, and a propane tank are common materials used to create a large "fireball" explosion; i.e., by spreading the gas on the ground, lighting the gas, putting the propane tank in the middle of the gas, and then shooting the propane tank.

During the incident, witnesses observed that defendant looked "crazed," "distant, far-off" and "disconnected." He was yelling "something about Christians," and " 'Fuck Barack Obama' "; " 'Kill Obama' "; " 'Kill all the little fags' "; and " 'Fuck A.I.G.' "

Two children suffered nonfatal gunshot wounds from the attack. The jury convicted defendant of numerous counts of premeditated attempted murder and assault with a firearm, with true findings on personal firearm use and great bodily injury enhancements.

*Sanity Phase*

Four psychiatrists (Drs. Jaga Glassman, Richard Rappaport, David Naimark, and Park Dietz) testified at the sanity phase of the trial. These experts summarized

3

defendant's history of mental illness and his expressed motivations for the attack, and opined on the issue of his sanity at the time of the offense. All the doctors agreed that at the time of the offense defendant suffered from a serious mental illness involving delusional beliefs. There was also no dispute that he understood the nature and quality of his acts, and that he understood his acts were *legally* wrong. However, the experts were not unanimous on whether defendant understood his acts were *morally* wrong. Dr. Dietz (retained by the prosecution) opined defendant understood the immorality of his conduct, whereas the other three doctors opined he did not.[1]

Evidence presented at the sanity phase showed that defendant had long-standing delusions that members of a conspiracy were persecuting him, including by torturing him, holding him captive in a basement, threatening his life, preventing him from dating younger women, making false claims that he had committed rape, and telling women that he was homosexual. In the months prior to the offense, defendant sent e-mails to his half-brother (Larry) and made lengthy journal entries that set forth his beliefs and perceptions. In these writings, as well as in his statements after the offense, he stated that the members of the conspiracy (who were part of "AIG insurance" and the "Illinois Underground Political Weathermen") did not trust him because he knew about their illicit activities; they thought he might "narc" on them; the only way he could escape their persecution was to join them and commit a horrible terrorist act so that he would be

---

[1] Drs. Glassman and Naimark were appointed by the court, and Dr. Rappaport was hired by the defense.

discredited; and he had decided that he had no choice but to commit a terrorist attack in order to stop the persecution and to save and improve his life.

In 2009 and 2010, defendant sent e-mails to Larry stating he needed to commit a "horrible act against rich people . . . ." and he intended to join the "Illinois Underground Political Weathermen to go around and slaughter rich people's families. . . ." In a March 5, 2009 e-mail, he told Larry that "his two options were to join the Peace Corps and help humanity, where he . . . might meet a nice young woman, or to do a horrible criminal act for the organization so they will no longer file false rape and/or sexual harassment claims, harass or torture [him], and [he] can lead a successful life." In another e-mail, defendant wrote that he "was being harassed to commit . . . a horrible act . . . for the Illinois Underground Political Weatherman terrorist organization by taking someone else's happiness away from them and that doing so could give him happiness and success." In a February 5, 2010 diary entry, defendant wrote that a neighbor told him that "AIG Insurance and Illinois Political Weatherman . . . will be watching him . . . to make sure [he] commit[s] the act of terror for them . . . by . . . killing Christian elementary school children." The journal entry states that he should put gas grill propane tanks under elementary school buses; shoot a flare gun at the propane tank to mark it; shoot the flare on the tank with a gun; and if the school bus does not explode he should shoot the children and pour gasoline on them.

In a July 25, 2010 e-mail to Larry, defendant wrote: "I'm going to join AIG insurance and destroy people's lives, and I will get paid for it. By me destroying American citizens' lives, I will be exposing AIG insurance and Illinois politicians in the

5

news for what they are all about, and that is cocaine and corruption for the money . . . ."

In August 2010, defendant received a 60-day eviction notice to vacate his apartment, and he wrote in his diary that he believed the conspirators had caused this problem.[2]  In an August 24, 2010 e-mail to Larry, he wrote that a woman must have filed a false rape claim with his apartment manager; it looked like AIG insurance was determined that he commit the terrorist attack because they were continuing to file false rape claims against him and making sure no women would date him; and he had no other choice now but to commit the terrorist attack.

In a diary entry, defendant wrote that if he committed the terrorist attack he would be able to collect unemployment from Illinois and California and receive a "lavish retirement" because "everybody who does crimes on behalf of the Illinois' corrupt politicians gets taken care of."  In an August 30, 2010 e-mail to Larry, he wrote:  "you were the one who said if you could not beat them, then join them.  Therefore, that is exactly what I am going to do.  I want to destroy some lives, in fact many lives, and laugh in their faces while being paid by AIG insurance and Illinois political Weathermen, because life is all about [greed], money, cocaine, torture, and corruption . . . ."  In a September 27, 2010 e-mail to Larry, he wrote:  "once I do what AIG insurance and the Illinois Political Weathermen tortured me to do, then they will pay me handsomely for doing it and they will leave me alone.  Like you said, if you can't beat them, then join

_____

[2]     He was being evicted from his apartment due to repeated complaints of harassment from his neighbors.

6

them, because in this cruel world called life, there is no justice at all, and the only thing that pays is crime . . . ."

While at the police station after his arrest on October 8, 2010, defendant told the police he went to the school to "kill white Christian children in an act of terrorism, intending to blow up a school bus occupied by children." Defendant told detectives that there were Illinois political leaders involved in cocaine trafficking, corruption, and fraud; they did not trust him and thought he would "narc on them"; and these political leaders (and persons associated with AIG insurance) told him to commit a "terrorist act" so they "would have nothing against [him] and they would leave [him] alone." He told detectives he was directed "by AIG and Illinois political Weatherman" to commit the attack to send a message; he "just didn't want to be tortured no more"; and he "figured no one would help" him. When a detective asked if he thought what he did was wrong, he said, "I had no choice. I was tortured and harassed for years . . . ." During a jail psychiatric evaluation the day after the attack, defendant reiterated that he "was trying to commit a terrorist attack and kill white Christian children . . . ." On October 12, 2010, when asked by Secret Service investigators if he knew he could have killed children, he answered that he did not care and he carried out the attack to stop the harassment and torture.

After personally examining defendant and reviewing his history and writings, Dr. Dietz assessed that defendant thought he was "doing the bidding of a group he thought of as a terrorist organization, and he saw them as urging him to commit a terrorist act so that he would be discredited and would be unable to narc on them by telling the authorities of their crimes." Dr. Dietz testified that defendant "felt as though he could not escape the

7

persecution from these delusional persecutors and that the way to get them off his back . . . was to commit some terrorist act or horrific crime at their behest. And the reason that would get them off his back is that once he was declared a felon or thought to be crazy, that he would be discredited and so they wouldn't have to worry that he'd tell the authorities about their wrongdoing."

Dr. Dietz opined that defendant knew his acts were morally, as well as legally, wrong. Dr. Dietz testified that in the months prior to the offense even though he was experiencing daily delusions of persecution, he nevertheless made statements indicating that he had "sufficient moral reasoning to know that it's wrong to hurt children." For example, he addressed moral and ethical issues in papers he wrote for college classes, including expressing concern for children in the community. In the same year of the offense, he repeatedly told a coworker that "anyone who hurts children is a coward and ought to be killed." Dr. Dietz opined that although these statements did not necessarily illuminate his moral reasoning at the time of the offense, they showed that "his moral reasoning in general remained intact despite his delusional beliefs."

Dr. Dietz also testified that defendant showed he was engaging in moral judgments when he made numerous statements, both before and after the offense, referring to the conspirators as part of a terrorist organization, and characterizing his conduct as a horrible terrorist act. When he mentioned to his half-brother in March 2009 that his two options were the Peace Corps or doing a horrible criminal act, this showed he understood there was a choice between doing good deeds or a horrible criminal act.

8

Dr. Dietz noted that defendant continued to use language of moral condemnation in his February 2010 diary entry describing his anticipated conduct as an "act of terror," and in his August 2010 e-mail stating he had no other choice but to commit the terrorist act. His two e-mails in August and September 2010 shortly before the offense—stating that he planned to destroy lives and laugh in their faces while being paid because the only thing that pays is crime—reflected that he was "resigning himself to becoming a terrorist, to becoming a criminal, to harming people, to doing bad things that he doesn't believe are morally right, he knows they're morally wrong, in order to escape his persecutors." Also, when interviewed by the authorities after the offense, he described his conduct as a terrorist attack, and upon inquiry he did not deny his conduct was wrong but instead said he had no choice. According to Dr. Dietz, defendant's statement that he did not care if he could have hurt children reflected that even though he knew his conduct was legally and morally wrong, "he thought that it was worth it if it would make things better for him."

Unlike Dr. Dietz, the three other testifying psychiatrists opined that defendant did not know that his conduct was morally wrong because he believed that conspirators had forced him to engage in the terrorist attack; he would be killed if he did not commit the attack; the attack was the only way to stop the torture he was enduring; and anyone in a similar circumstance would have done the same thing to try to be freed from the torture.

The jury rejected defendant's insanity defense, finding him sane at the time of the offenses. The court sentenced him to a determinate term of 90 years and an indeterminate term of 99 years to life.

9

DISCUSSION

Defendant argues the jury could not reasonably reject the evidence that he was insane when he committed the attack at the school.  In support, he contends there was uncontradicted evidence that he had a mental defect that produced delusions of persecution, and he believed the attack was the only way to stop the persecution.  He acknowledges he knew the attack was *legally* wrong, but argues he carried his burden to show he did not know it was *morally* wrong.

A person is legally insane when due to a mental disease or defect, the person was " 'incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong at the time of the commission of the offense.' "  (*People v. Coddington* (2000) 23 Cal.4th 529, 608.)  The concept of " 'wrong' " includes both legal and moral wrong; thus, a person " 'who is incapable of distinguishing what is morally right from what is morally wrong is insane, even though he may understand the act is unlawful.' "  (*Ibid*.)  Morality in the context of the insanity defense means generally accepted moral standards, and not distorted standards devised by the accused.  (*Id*. at pp. 608-609.)  Thus, a "defendant is sane if he knows his act violates generally accepted standards of moral obligation whatever his own moral evaluation may be."  (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1274.)  The defendant bears the burden of proving insanity by a preponderance of the evidence.  (*Coddington, supra*, at p. 608; Pen. Code, § 25, subd. (b).)  On appeal, we apply the substantial evidence test, drawing all reasonable inferences in favor of the judgment.  (*People v. Chavez* (2008) 160 Cal.App.4th 882, 891; *People v. Belcher* (1969) 269 Cal.App.2d 215, 220.)  We may not

10

reject the jury's sanity finding unless "as a matter of law [the jury] could not reasonably reject the evidence of insanity." (*People v. Skinner* (1986) 185 Cal.App.3d 1050, 1059.)[3]

The record supports the jury's finding that defendant understood the immorality of his conduct at the time of the offense. Although the evidence showed he thought he had to commit the acts to stop the persecution he believed he was suffering, the jury was not compelled to find that he did not understand that it was immoral to shoot at innocent people at an elementary school, including children, notwithstanding his desperation to free himself from the perceived persecution. When writing and talking about the offense before and after its commission, he repeatedly described it as a horrible terrorist attack and stated he was doing it to save himself and improve his life. Because defendant stated that the attack was horrible and that his motive for committing the attack was to protect himself, the jury could reasonably infer that he understood the immorality of his decision to jeopardize the lives of innocent people in order to save himself.

This is not a case where a defendant attacked his *perceived persecutors*; rather, defendant attacked people at an elementary school with no indication that he thought they had anything to do with his suffering. Nor is this a case where the defendant's thought

_____

3       Defendant's contention that traditional substantial evidence principles do not apply to sanity verdicts is unavailing. Statements by reviewing courts that focus appellate review on the weight of the insanity evidence, rather than on the evidence in support of sanity, do not alter these principles, but merely underscore that the prosecution need not establish sanity. (See, e.g., *People v. Drew* (1978) 22 Cal.3d 333, 351 ["The prosecution presented no evidence at the sanity trial. Defendant, however, has the burden of proof on the issue of insanity; if neither party presents credible evidence on that issue the jury must find him sane. Thus the question on appeal is not so much the substantiality of the evidence favoring the jury's finding as whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it."]; *People v. McCarthy* (1980) 110 Cal.App.3d 296, 300.)

11

processes were essentially focused on committing a crime to serve some greater public good that could provide subjective moral justification for the misconduct. Given defendant's repeated acknowledgement that his conduct was horrible and terroristic and that he was acting to save himself, the jury could reasonably conclude that he knew his conduct was morally wrong because he was acting to protect himself without regard to the severe trauma inflicted upon innocent people, including children.[4] Moreover, even if the jury thought that defendant sincerely believed he was acting to expose corruption and to save his life, the jury could also find that his recognition of the horrific nature of his conduct reflected his understanding that under generally accepted moral standards, the exposure of corruption and even the saving of one's own life would never justify opening fire on innocent children at an elementary school.

To support his challenge to the jury's rejection of his insanity claim, defendant asserts Dr. Dietz's opinion that he knew his act was morally wrong was not based on sound reasoning. He delineates various aspects of Dr. Dietz's testimony that he finds deficient for a variety of reasons. We are not persuaded. As set forth above, Dr. Dietz's opinions were well reasoned and supported by the evidence. Further, the record does not support defendant's contention that Dr. Dietz's testimony failed to differentiate between

---

[4]     Some of defendant's statements could suggest that he felt his terrorist act would expose the corruption he perceived was being committed by his persecutors. Notwithstanding this evidence, the jury was not required to conclude that his driving motive was a selfless intent to expose corruption. Rather, the jury could reasonably find that his repeated statements that he wanted to stop the persecution being inflicted upon himself showed that he felt he was acting primarily for his own interests and not for the greater common good. Indeed, one of the experts who opined defendant was insane conceded that defendant did not think he was acting for a higher purpose apart from his own interests.

the moral component and the legal component of the right/wrong awareness standard. Dr. Dietz frequently focused his opinions on whether defendant understood the immorality of his conduct, and he did not simply address in unitary fashion the question of defendant's awareness of the wrongfulness of his conduct.

It was the jury's task to evaluate the experts' differing opinions, and the jury was not required to reject Dr. Dietz's reasoned opinion merely because three other experts disagreed with him. (*People v. Wolff* (1964) 61 Cal.2d 795, 804 ["if there is substantial evidence from which the jury could infer that the defendant was legally sane at the time of the offense such a finding must be sustained in the face of any conflicting evidence, expert or otherwise, for the question of weighing that evidence and resolving that conflict 'is a question of fact for the jury's determination' "]; *People v. Chavez, supra*, 160 Cal.App.4th at p. 891 [jury may reject expert opinion on insanity unless defendant demonstrates it "was of such weight that the jury could not reasonably reject it"].)

In support of his assertion the jury could not reasonably reject his insanity claim, defendant points to his various statements that reflected his sense of desperation. For example, he cites his statements to Dr. Dietz, "I had nowhere else to go," and to a police officer, " 'What was I supposed to do, Dude?' " and contends these statements demonstrated his inability to distinguish moral right from wrong by showing that he thought "anyone in his position would have done what he did," and he "felt he had no choice and he acted correctly based on the situation he was in." Although the jury could have reached such a conclusion, it was not required to do so. Even though defendant may have felt desperate to stop the perceived persecution, the jury could reasonably find that

13

he knew he was acting immorally based on his acknowledgement that his conduct was horrible and designed to save himself at the expense of innocent people.

Defendant further posits that, in his mind, he was in a position similar to a starving person who steals food, which would be legally, but not morally, wrong. The contention is unavailing. When evaluating moral awareness of the defendant, food theft is not akin to a violent attack on innocent people.

Finally, defendant cites *People v. Stress, supra*, 205 Cal.App.3d 1259, a case in which the appellate court noted that an inability to distinguish moral right from wrong could be based on the defendant's belief that his act of killing his elderly, ailing wife did not violate accepted moral standards because it was the only way to obtain a public forum to communicate information vital to public safety. (*Id*. at pp. 1263-1267, 1271-1276.) Defendant asserts that, akin to the scenario described in *Stress*, he believed his conduct would be considered morally acceptable once the reasons for his actions were known.[5] The record does not compel this finding. As stated, the jury could reasonably find that defendant understood he was not acting to serve a higher common good, or even if he thought he was, he knew a random shooting attack on elementary school children would not be viewed as justifiable under generally accepted standards of morality.

The record supports the jury's rejection of defendant's insanity claim.

---

[5] The appellate court in *Stress* reversed and remanded the case because the trial judge, who was conducting a bench trial, had not understood that an insanity defense can be based on the inability to distinguish *moral* right from wrong, as well as legal right from wrong. The appellate court concluded it was reasonably probable the trial judge would have found the defendant insane had the judge been aware of the morality component of the right/wrong distinguishment standard. (*People v. Stress, supra*, 205 Cal.App.3d at pp. 1261, 1271-1276.)

14

DISPOSITION

The judgment is affirmed.

                                                                    HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.