Filed 11/13/15  P. v. Pierce CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C075399 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F01198) |
| v. | |
| JOHN MURDOCK PIERCE, | |
| Defendant and Appellant. | |

It is undisputed that defendant John Murdock Pierce shot and killed his wife Tiffany and shot and injured his 11-year-old daughter S.  The only issues at trial were whether defendant had the mental state required to commit the charged crimes, and if so, whether he was legally insane at the time he committed those crimes.

Following a consolidated bench trial, the trial court found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a))[1] and assault with a firearm (§ 245, subd. (a)(2)). It also found true allegations defendant discharged a firearm causing death in the commission of the murder (§ 12022.53, subd. (d)), personally used a firearm in the commission of the assault (§ 12022.5, subd. (a)), and personally inflicted great bodily injury in the commission of the assault (§ 12022.7, subd. (a)).[2] The trial court rejected defendant's insanity defense and determined that the defense failed to meet its burden of showing that defendant was insane when he shot his wife and daughter. The trial court sentenced defendant to an aggregate term of 50 years to life, plus nine years in state prison, consisting of 25 years to life for the murder, a consecutive 25 years to life for the firearm enhancement for the murder, a consecutive two years for the assault, a consecutive four years for the firearm enhancement for the assault, and a consecutive three years for the personal infliction of great bodily injury enhancement for the assault.

On appeal, defendant contends (1) the trial court erred by considering the truth of his statements to doctors as proof of his mental state, (2) there is insufficient evidence to support his conviction for first degree murder, and (3) "[t]he preponderance of the

---

[1] Further undesignated statutory references are to the Penal Code.

[2] Generally speaking, where, as here, a defendant pleads not guilty and not guilty by reason of insanity, "the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, . . . then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court." (§ 1026.) Here, however, defendant waived bifurcation of the guilt and sanity phases of the trial and a jury trial. (See *People v. Dessauer* (1952) 38 Cal.2d 547, 554 ["At least in a case tried by the court without a jury the right to have guilt and insanity separately tried may be waived."].) Thus, the issues of guilt and sanity were tried together to the court.

evidence demonstrated [he] was insane as a matter of law" when he shot his wife and daughter.

We shall conclude that defendant forfeited his challenge to the court's reliance on statements he made to doctors by failing to raise the issue below and that sufficient evidence supports his first degree murder conviction and the trial court's finding that he was sane at the time of the shootings. Accordingly, we shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A.     *The Prosecution's Case-in-chief*

On February 13, 2011, defendant shot and killed his wife Tiffany and shot and injured his 11-year-old daughter S. Defendant was 36 years old at the time of the shootings.

S. testified that in February 2011 she lived at 5332 Valparaiso Circle with her father (defendant), her mother Tiffany, and her 5-year-old twin brothers. Defendant and Tiffany argued "[p]retty often." S. recalled that defendant began acting odd a year or two prior to the shootings. The odd behavior came on gradually, then began to add up. In the weeks before the shootings, defendant began talking about mold in the house and how it was poisoning his family. Less than a week before the shootings, he drew an eye and wrote a bunch of words and numbers on a white board that Tiffany used to keep track of the chores. Among other things, he wrote "Y-tricity," which he said was the ability to create energy from nothing. He also wrote "2300200000," which he said represented the national debt, and that he intended to pay it using gambling winnings. He said he "was writing all that up . . . to get it out of his head so other people could look at it." A day or so before the shootings, S. found defendant rummaging around her room and her mattress on its side. The day before the shootings, defendant put keys and a figurine in a bowl and took them, along with some marijuana he had been growing, to a neighbor's house and attempted to gain entry using the keys from the bowl. He did not know the neighbors, who had recently moved in.

3

The night before the shootings, the family ate dinner together and everyone appeared to be getting along. S. slept on the couch in the living room, and when she woke up around 7:00 a.m. the following morning, she saw defendant sitting in a rocking chair a couple of feet away. He had a handgun and a long blue rope that he normally kept in the car. The rocking chair normally was kept in the twins' room. Sometime after S. woke up, defendant got the twins, sat them on the couch next to S., and told the three children to watch television while he went to get Tiffany.

Tiffany sat down on the couch next to S., and Tiffany and defendant immediately began arguing. When Tiffany stood up, defendant pushed her back down. When Tiffany got up and attempted to leave, defendant pointed the gun at her and threatened to shoot her in "the kneecap or the foot or something." He told her that if she opened the door or went outside the house would explode and she would kill the family. She told defendant, "[S]hoot me asshole . . . you're putting our whole family in jeopardy and mak[ing] your kids not like you or trust you any more." The argument turned physical, and defendant pushed Tiffany into the rocking chair and attempted to tie her to the chair using the blue rope. Tiffany resisted, and defendant struck her in the head three times with the butt of his gun. Tiffany told S. to call 911, and S. ran to the phone, which was mounted to the wall. As she was dialing, defendant shot her in her right arm, causing her to drop the phone. After S. was shot, she and Tiffany ran to the front door and attempted to unlock it. S. eventually unlocked the door ran outside.

Doug Munson, who lived across the street from defendant and his family, was in his front yard on the morning of February 13, 2011, when he heard a loud noise and saw S. run out of her house holding her arm. Less than 30 seconds later, he heard at least one more shot. He took S. inside his house, told his wife Natalie to call 911, and then got his gun. Meanwhile, Natalie tended to S. S. told Natalie that her father (defendant) shot her. When Natalie asked S. why defendant shot her, S. explained that "her mom and dad had been arguing, and her dad was trying to tie her mother up on the floor so he could shoot

4

her in the head in front of her little brothers.  She went to dial 911 for help and he shot her."  Law enforcement arrived soon thereafter, and S. was taken to the hospital where she stayed for "[a]bout a month" and had six or seven surgeries.

When deputies with the Sacramento Sheriff's Department arrived at the scene, the front door and security screen of defendant's home were open.  A male voice could be heard yelling something from inside the house as portions of a disassembled Glock handgun were thrown out the door.  Moments later, defendant walked outside wearing only black underwear, a blue and gold necktie, and an American flag bandana tied around his head.  He was taken into custody and admitted shooting Tiffany and S.

Deputies found Tiffany lying across the threshold of the house.  There was a blue rope coming out from underneath her body and extending inside the house and on to a couch.  No vital signs were detected.  Deputies found the twins in a back room crying but unharmed.

Defendant was interviewed by homicide detectives later that day.  A video and audio recording of the interview was played for the court.  Many of defendant's responses to the detectives' questions were nonresponsive and/or nonsensical.  The following excerpts pertain to the shootings:

"Det. Belli:  I asked you - right.  So why did you shoot your wife?

"[Defendant]:  Because I was in danger.

"Det. Belli:  Okay.  How?

"[Defendant]:  I gotta bite my teeth over everything.  My street, my address.  Everything.  I was, uh - and man named (Terry Shaeffer).  (Darryl) - (Daryl) and (Terry Shaeffer).

"Det. Belli:  Mm-hm.

"[Defendant]:  And then the name changes to - what was it?  (Daryl) T-uh, it's just so many darn things they keep swapping the first letter to the middle, switches it back change it back in and they - or she changes it.  (Unintelligible).  It got so bad I had to put

5

my fricken name on the top of the fricken mailbox outside.  This is the number.  Don't put anything else in there.

"[¶] . . .[¶]

"Det. Belli:  Mm-hm.  Did you shoot ([S.]) today, too?

"[Defendant]:  That was on the struggle of the phone.

"Det. Belli:  Okay.  Was that because . . .

"[Defendant]:  I was -- I wasn't sure (Unintelligible).

"Det. Belli:  Okay.  What were you afraid she was gonna - who - who were you afraid . . .

"[Defendant]:  I was afraid to call - call the phone and blow the whole fucking place up.

"Det. Belli:  Who did you think she was gonna call?

"[Defendant]:  A person that's - who's the for - the fricken black magic crew or want to proceed to be some kind of (Unintelligible), some . . .

"Det. Belli:  You didn't think she was going to be calling the police?

"[Defendant]:  She never will.  I try taking her to that place.  I - has she gone anyplace for the last 5 months?  That's - three or five months since, uh - since before Christmas."

Defendant later was asked about the gun.

"Det. Belli:  So, why did you go get the gun today?

"[Defendant]:  I knew she was going to play again.  I haven't had the house cleaned . . . [¶] . . . [¶] . . . in the last three years.  She will not clean it.  Clean out my lungs or the kid's laundry.  I mean, stuff's just packed in there.  You can't get away from dust and dirt and mold and th- all that.  When we moved in there the place was supposed to have been remodeled four years before we were in there.

"[¶] . . . [¶]

"Det. Belli:  Yeah.  So when you got the gun and you loaded it today?

6

"[Defendant]: I was in fear for my life . . . [¶] . . . [¶] . . . and my children.

"Det. Belli: How were you gonna - how were you gonna get hurt? What were you afraid of?

"[Defendant]: I was afraid they were going to come tie me up and throw me in the fricken river.

"Det. Belli: Who?

"[Defendant]: Some dude talk 'cause he's a hard mother fucker.

"Det. Belli: Were you afraid your wife was gonna do it?

"[Defendant]: Yeah. I was afraid - afraid to go to sleep. Gonna get the house cleaned. She (unintelligible) a dirt spot. She went and got a diaper out of the trunk of the car and put it on my boy."

Defendant also told detectives that he smoked marijuana the night before the shootings, and took a couple of Vicodin pain pills and a shot of whiskey immediately after.

Days before the shootings, neighbors saw defendant beating on a drum outside his home. About a week before the shootings, a neighbor overheard an argument between defendant and Tiffany. Defendant was inside a car, and Tiffany was attempting to keep him from leaving. At one point, defendant drove forward and almost hit Tiffany. Things eventually "toned down," and defendant and Tiffany went inside. During the three years prior to the shootings, that same neighbor had seen defendant and Tiffany on at least one hundred occasions playing with their children in the front yard "[l]ike a happy family." Around midnight the night before the shootings, defendant went to the home of another neighbor and asked to come inside. He had a flyer and said he wanted to see the layout of the home to compare to another home that someone was trying to sell. The neighbor did not invite defendant inside. The neighbor thought defendant was acting strangely and may have been on drugs.

In late 2010, defendant telephoned his sister in distress. He was concerned that "they" were trying to kill him and asked her to come pick him up and to bring a trailer. When she asked defendant to have his doctor check his medications, defendant said that he wasn't crazy, called his sister a "fucking bitch," and hung up. Defendant's sister testified that their father "was very paranoid a lot of the time" while she and defendant were growing up. He worried that his wife was cheating on him and spied on their mother while she was working. His paranoia worsened as he got older, and he began to worry about the neighbors and the government.

B.      *The Defense*

Dr. Jessica Ferranti, a forensic psychiatrist, was appointed by the court to evaluate defendant's competency to stand trial pursuant to section 1369 and determined that he was competent to stand trial. At trial, she testified for the defense as an expert in forensic psychiatry. She examined defendant in August and September 2011. She focused on how defendant was doing at the time of her evaluation, and not on his mental state at the time of the shootings. Thus, she did "not devote a significant amount of [her] assessment to [defendant's] mental state at the time of the crimes in question." Nor did she feel comfortable giving an opinion on that issue.

Dr. Ferranti diagnosed defendant with psychotic disorder not otherwise specified, which "denotes a psychotic disorder is present but there's either insufficient information or conflicting information that prevents a more specified diagnosis at that particular time." She based her diagnosis on her review of defendant's interview with detectives following the shootings and her own examination of defendant. She explained, "You can see on that interview tape [(with detectives)] that [defendant] is floridly disorganized, he has loose associations, he is not able to make linear and logical commentary to the police." When she asked defendant about the shootings and events leading thereto, "he expressed a lot of bewilderment, a lot of perplexity about what had happened" and "had a difficult time making sense of some of his own actions." He told Dr. Ferranti, "I was

8

trying to get off weed so that I could get a job after getting two or three weeks clean. My wife brought some more cannabis home. She said, Forget about it. I couldn't sleep at all that night. I had a panic attack and then the bomb thing happened. [¶] I knew they changed the hot water heater and I thought that was the way to get a bomb in the house." He had been worried about a bomb being placed in his home for "about ten years." He explained that he gathered his family together on the morning in question because he wanted to talk to them, explaining, "I just wished someone would have talked to me instead of arguing when I needed just to talk. I was trying to get her to talk to me." He said he did not intend to shoot anyone. Dr. Ferranti also found it significant that the psychiatric records from the jail indicated that defendant was hospitalized in the acute psychiatric unit shortly after he was taken into custody "because he was observed by custody officers and others in the jail to be very disorganized, not attending to his daily living activities."

Dr. Ferranti reviewed a variety of documents, including defendant's rap sheet, which revealed no criminal history, and toxicology report, which indicated defendant tested positive for Delta 9 THC, the active ingredient and marijuana, and hydrocodone, an opiate found in drugs like Vicodin, following his arrest. She also reviewed defendant's medical records, which indicated defendant previously had not been treated for mental illness, other than depression and anxiety. Dr. Ferranti also explained that schizophrenia and bipolar disorder can run in families.

On cross-examination, Dr. Ferranti testified that the usual age of onset for schizophrenia in men is in the late teens or early 20's, and the usual onset period is two to three years, but "[t]here are people who can have psychotic symptoms that can be low grade that kind of simmer there for many, many years before they come to clinical attention." It is common for people suffering from schizophrenia for an extended period of time to have run ins or contact with law enforcement, and it would be unusual for defendant not to have had any such contacts if he had been suffering from schizophrenia

9

for a number of years. Dr. Ferranti's diagnosis was consistent with defendant's treating psychiatrist at the jail.

Dr. Matthew Soulier was retained by the defense to perform a psychiatric evaluation of defendant and testified as an expert in forensic psychiatry. He examined defendant twice at the main jail and diagnosed him with schizophrenia and concluded that he was cannabis dependent.

Dr. Soulier determined that at the time of the shootings defendant had the ability to understand the nature and quality of his acts, predict the natural and probable consequences of his acts, make a plan of action, and understand the lawful rights of others. He based his findings on, among other things, defendant's retrieval and loading of the gun, defendant's statement that he intended to threaten Tiffany with the gun, his knowledge that the gun could harm someone, and his disassembly and disposal of the gun when deputies arrived.

Dr. Soulier also found that while defendant understood that his actions were legally wrong, he did not understand that they were morally wrong. According to Dr. Soulier, the foundation of defendant's acts "was just purely psychotic. It was paranoid. It was irrational. It was illogical. Thus, rendering him in my opinion unable to understand the moral wrongfulness of what he was doing." Dr. Soulier explained, "The premise by which . . . he shot his wife was he perceived that she was, in fact, a danger to him. That she in some way was related to a bomb, perhaps in a conspiracy with neighbors or others to harm him." Dr. Soulier opined that defendant was in a "psychotic frenzy" at the time of the shootings, meaning he was disorganized in his ability to process and organize information, and as a result, lumped things together in an illogical manner, explaining that defendant's "primary concerns are that he perceives his wife isn't helping, isn't working. He's got this additional concern about bombs and people reading his thoughts. It's all getting jumbled together and he doesn't really have the mental capability to organize this information, to process it in a rational way, and it all kind of

10

gets entangled together in a very psychotic manner." He also opined that while defendant had the capacity to act in a considerate, calculating, and controlled way at the time of the shooting, the shooting "was carried out fairly impulsively."

On cross-examination, Dr. Soulier acknowledged that it would be a little unusual for schizophrenia to come on at defendant's age, but he remained confident in his opinion that defendant suffered from schizophrenia at the time of the shootings based on "the severity of the symptoms." Dr. Soulier also acknowledged that defendant told him that during the week prior to the shootings, he had been focused on "[t]rying to get my wife to do chores so that I could go to work," and he "freaked out" on the morning in question because Tiffany "wasn't paying attention to the house and chores." He was also upset that she brought marijuana into the house when he was trying to quit so that he could get a job and believed his wife "was in on the bomb, too." He had been worried about a bomb since about 1990. He used the gun to get Tiffany's attention because "[s]he never paid attention to nothing. [¶] . . . [¶] She made bad decisions. She wasn't talking to me. I was asking her questions about going to work and getting a job and doing chores."

When the trial court asked Dr. Soulier whether his opinion that defendant did not understand that shooting his wife would be morally wrong was based on defendant's belief that "he was protecting himself from the house being blown up or his wife pushing the button on the bomb," Dr. Soulier clarified that defendant did not necessarily use the word "protection," explaining: "I don't know that he specifically tagged it to protection: I'm going to shoot you so that I don't get hurt. [¶] It was more of this, my wife's doing these bad things, she's not doing chores, she's not taking care of me and she's plotting a bomb, and boom." Dr. Soulier agreed that defendant's belief regarding the presence of the bomb was a delusion, and that his belief about his wife not doing work around the house was not. He also agreed that "mates rationally are frustrated with their mates who don't do chores and don't clean up the house and that we consider that to be a logical thought." He found, however, that "what makes . . . even that illogical for me [in this

11

case] is that people don't logically pull out guns and threaten people who don't do chores and don't clean around the house. [¶] Is it -- is it different than the bomb? Yes, I think they're two different thoughts. I don't know that they are the same, but I don't know I would go so far as to say this is definitely [a] rational and moral understanding and this one is definitely not." Dr. Soulier believed that defendant did appreciate that it would be morally wrong to shoot his wife because he was dissatisfied with her contributions around the house.

Dr. Charles Benjamin Schaffer was appointed by the court to perform a psychiatric evaluation of defendant pursuant to section 1027. He also testified for the defense as an expert in forensic psychiatry. He examined defendant in March and April 2012 and diagnosed him as suffering from either a bipolar or schizoaffective disorder, explaining that the disorders are similar and he was unable to separate them in defendant's case because he did not treat defendant over time and evaluated him only after he had been medicated. Bipolar disorder is characterized by episodes of depression and mania. Schizoaffective disorder is characterized by the same episodes, plus psychotic symptoms such as delusions and hallucinations.

Defendant told Dr. Schaffer that he started taking Vicodin daily a few weeks prior to the incident, and Dr. Schaffer believed that the hydrocodone influenced defendant's behavior on the date in question, noting that "this seems to be his most disturbed episode where he demonstrated the most extreme symptoms." Dr. Schaffer also had conducted a study and found that "there were more patients with bipolar disorder who had a manic reaction to Vicodin [(hydrocodone)], and none in the group who didn't have bipolar disorder."

Dr. Schaffer opined that at the time of the shootings, defendant had the ability to understand the nature and quality of his acts because he "knew he had a gun, and that he was shooting his daughter and wife with a gun, and that was a serious act" that could cause serious injury. Dr. Schaffer further opined that while defendant had the capacity to

distinguish right from wrong morally when he shot S., he lacked such capacity when he shot Tiffany because "he did that in self-defense." Dr. Schaffer also found that at the time of the shootings, defendant had the capacity to make a plan of action and act in a purposeful and goal-directed way, but he lacked the capacity to act in a considered, calculated, and controlled way. He concluded that shooting Tiffany was an impulsive act, reasoning that there was a good chance defendant would not have shot her had she listened to him and not walked out the door.

On cross-examination, Dr. Schaffer agreed that defendant's actions in getting the gun, making threats, requiring Tiffany to stay in the living room, and threatening her when she tried to leave were more calculated than impulsive. He acknowledged that none of the medical records he reviewed indicated that defendant had ever complained of anything indicative of psychosis, including paranoia, delusions, or hallucinations, prior to the incident in question. He also confirmed that defendant reported that he was experiencing some stress related to conflicts with his wife prior to the incident, including her failure to clean the house on a regular basis and attempt to get defendant to resume using marijuana. Defendant also expressed concern about being robbed by people who had been driving a U-Haul in his neighborhood and a bomb that he believed had been planted in his water heater. Defendant explained that he did not report his concerns about the bomb to police because "I've been fighting with those thoughts for ten years."

C.    *Rebuttal*

The prosecution called John Alan Foster, a licensed psychologist with a Ph.D. in psychology, in rebuttal. Dr. Foster was appointed by the trial court to examine defendant and evaluate his mental state pursuant to section 1027. He examined defendant in February and March 2012 and diagnosed him with a psychotic disorder not otherwise specified at the time of the offense, but concluded that "it didn't appear to be at a level that totally interfered with his capability of performing actions" and was not "so fully developed that he was incapacitated . . . fully in his thinking." He based his conclusion

13

on, among other things, defendant's ability to recall "specific details regarding the nature of the offense." Dr. Foster opined that "once [defendant] got into custody and maybe [had] some sense of [the] gravity of what happened that there was some breaking way of his mental condition and . . . it developed into a more definable mental disorder."

Dr. Foster determined that defendant had the ability to understand the nature and quality of his acts at the time of the shootings based on defendant's knowledge that it was a crime to use a firearm on another person and that a loaded firearm could injure or kill another person, and defendant's statement that he was angry with his wife and pointed the loaded gun at her to get her to talk to him.

Dr. Foster also opined that at the time of the shootings defendant had the ability to distinguish right from wrong based on defendant's statement during the evaluation that he knew it was wrong to use his gun to injure his daughter and kill his wife but did not think about that at the time he shot them. When asked, "Is there a distinction you would draw about his ability to determine whether or not something is perhaps legally wrong, but not morally wrong," Dr. Foster responded, "Well, prior to the offense, [defendant] had indicated that he was angry at his wife, he was trying to get her to talk to him and had used the weapon in some fashion. . . . He said I pointed the weapon at her to get her to talk to me. [¶] . . . I . . . don't think there's any significant differentiation between legal and morally [wrong] here. I think he knew the weapon hurt his daughter, and he knew if he fired the weapon, it would kill his wife from the distances [*sic*] he was . . . it was a close range shot, from what I understand."

On cross-examination, Dr. Foster was asked about his reliance on defendant's ability to recall events in formulating his diagnosis and explained that in his "limited experience" treating people with psychosis, they are not able to recall specific details. Dr. Foster acknowledged that he had not treated anyone for a "psychological issue" since 2007, and prior to that time, had treated only two people who were suffering from

14

psychosis. He also noted that while he had not treated anyone suffering from psychosis since 2007, he had evaluated people who were suffering from it.

### D. *The Trial Court's Ruling*

The parties separately argued and the trial court separately addressed the issues of guilt and insanity. The court found defendant guilty of first degree murder and assault with a firearm and found the various enhancement allegations true. It determined that while there was no doubt that defendant "suffered from a severe mental disorder," he nevertheless intended to kill Tiffany and acted with premeditation and deliberation in doing so. With respect to intent, the court found that "it's clear from the evidence that the triggering element was [defendant's] frustration, his inability to control the situation. And by shooting Tiffany so clearly . . . in a spot that would be fatal, he is demonstrating his intent to kill." With respect to premeditation and deliberation, the court observed that whenever someone takes a gun, loads it, and then makes it available for use, "they're considering [at] every step whether or not to use that gun." Although the court found that defendant did not decide to kill Tiffany "until the point where she is going out the door," it concluded that at that moment he considered whether or not to do so. The court noted that defendant's state of mind at that moment, as stated to one of the doctors, was that "he couldn't get her to stop and talk to [him], he was angry. . . . He was afraid that she was going to leave," and leave him to care for the boys. The court was also persuaded by defendant's statement to one of the doctors that he was relieved that he would no longer have to deal with Tiffany again.

With respect to S., the trial court found that defendant intended to fire the gun, and thus was guilty of assaulting S. with a deadly weapon, and that his mental state did not negate his intent. The court rejected the notion that the shooting was accidental.

As for defendant's insanity defense, the trial court found that defendant suffered from "a profound mental illness" at the time of the shootings, but that the defense failed to show by a preponderance of the evidence that he was unable to understand the nature

15

and quality of his acts or distinguish right from wrong.  With respect to the nature and quality of his acts, the court found that "[h]e knew that if he fired that gun into his wife's head that he would kill her" and "when he fired the weapon at [S.] . . . he knew what he was doing."  As for the wrongfulness of his actions, the court rejected the notion that defendant shot Tiffany because "he felt he had to stop [her] in order to save himself," as well as the argument that defendant's mental disorder prevented him from considering the wrongfulness of his acts.  The court found that while it was clear that defendant had entertained paranoid thoughts for quite some time, "he has integrated those [thoughts] into his life."  The court explained, "He felt there might be a bomb in the . . . water heater.  But at the same time he stayed in the house.  He felt his neighbors might be able to read his thoughts, but still he would have loud discussions -- or at least on the one occasion -- outside with his wife."  The court continued, "So on February 13 [(the day of the shooting)], those delusions were not new, in kind.  They were new in intensity.  We have him tearing up [S.]'s room.  A couple of days before we have, of course, . . . the efforts he went to on this date to arrange the room, to get the gun to bring the rope.  But there's nothing new about his fear of a bomb or his paranoia.  [¶]  What is new, according to his history, the history he gave the doctors, is his disappointment in Tiffany, his anger with her for bringing the marijuana back, and implicit in that is his feeling that she was sabotaging his attempts to make something of himself.  [¶]  He's clearly not bringing Tiffany into the room with the kids in order to discuss the bomb in the water heater.  When they try to leave, he says, you can't leave or things will blow up.  But . . . his recitation of his thoughts at that time had to do with his disappointments in Tiffany.  [¶]  So the doctors focusing on -- I'm not going to say shoe horn, but I think it's a forced connection to fit the bomb paranoia into a self-defense and coming up with the understanding that [defendant] didn't appreciate that was morally wrong what he was doing.  [¶]  If that were the case, I would have expected in [defendant's] history to be

16

saying something along the lines of I had to do it. And although, there is some of that, the focus is on his disappointment with Tiffany."

## DISCUSSION

### I

### Defendant Forfeited His Claim That the Trial Court Erred When It Considered the Truth of His Statements to Doctors as Proof of His Mental State

Defendant contends "the court improperly relied on statements made by [him] to doctors appointed to evaluate him for his not guilty by reason of insanity plea as proof of the facts," thereby depriving him "of his rights under the United States Constitution to counsel, to due process, and against self-incrimination." As we shall explain, defendant forfeited this claim by failing to raise it below.

Drs. Ferranti, Soulier, and Schaeffer were called by the defense, and during their direct examinations, testified extensively concerning statements made by defendant during their evaluations of him.[3] At no point, however, did the defense request that the trial court limit its consideration of such statements. In particular, the defense never asked the trial court to regard defendant's statements only as showing the information on which the experts based their opinions, and not as proof of the truth of the facts discussed. Nor did the defense object when the trial court indicated that it had relied on defendant's statements to doctors in determining defendant's guilt. Had defendant objected, the trial court could have corrected its error, if any.

Having elicited the challenged evidence and thereafter failed to request the trial court limit its consideration thereof or object when the trial court indicated that it had considered such evidence in a manner defendant now contends was improper, defendant

---

[3] We note that unlike Drs. Soulier and Schaffer, Dr. Ferranti was appointed to evaluate defendant's competency to stand trial, *not* his mental state at the time he committed the charged offenses. Thus, defendant's statements to Dr. Ferranti appear to fall outside the scope of defendant's claim of error.

17

forfeited his claim of error.  (See *People v. Ledesma* (2006) 39 Cal.4th 641, 697-698; § 1259.)

## II
### Defendant's First Degree Murder Conviction is Supported by Substantial Evidence

Defendant next contends that his first degree murder conviction must be reduced to manslaughter because there is insufficient evidence of malice aforethought. Alternatively, he asserts that his conviction must be reduced to second degree murder because there is insufficient evidence of premeditation and deliberation.  We disagree with both contentions.

In reviewing a challenge to the sufficiency of the evidence, our "task is to determine whether, in light of the whole record viewed in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt."  (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.)  We " ' "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]" ' [Citations.]"  (*People v. Smith* (2005) 37 Cal.4th 733, 739.)  "The credibility of witnesses and the weight accorded the evidence are matters within the province of the trier of fact.  [Citations.]"  (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207.)  We " 'must accept logical inferences that the [trier of fact] might have drawn from the evidence even if [we] would have concluded otherwise.  [Citation.]' [Citation.]"  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)  "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the trier of fact's finding.]'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  "Such malice may be express or implied.  It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.)  "[T]he defendant need not intend to break the law or commit a crime.  Rather,

malice requires an *intent to kill* that is 'unlawful' because the law deems it so." (*People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*).) " ' "The adverb 'unlawfully' in the express malice definition means simply that there is no justification, excuse, or mitigation for the killing recognized by the law." ' [Citation.]" (*Ibid.*) Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.)

" 'A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.' [Citation.] 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Thus, the mens rea required for murder is malice, express or implied. [Citation.] [¶] Manslaughter, a lesser included offense of murder, is an unlawful killing without malice." (*Elmore, supra*, 59 Cal.4th at p. 133.)

" ' "Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citation.] But these categories of evidence, borrowed from *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" ' [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1253.)

"Self-defense, when based on a reasonable belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime. (§ 197, subd. 3; see 1 Witkin & Epstein, Cal. Criminal Law [(4th ed. 2012)] Defenses, § 67 et seq., p. 507 et seq.) A killing committed when that belief is

19

unreasonable is not justifiable. Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' " (*Elmore, supra,* 59 Cal.4th at pp. 133-134.) This mental state "is most accurately characterized as an actual but unreasonable belief." (*Id.* at p. 134, fn. omitted.) Unreasonable self-defense involves a mistake of fact and is not available "when . . . the need to defend oneself is entirely delusional." (*Id.* at p. 130.) "A purely delusional belief in the need to act in self-defense may be raised as a defense, but that defense is insanity." (*Ibid.*) "It may not be employed to *reduce* a defendant's degree of guilt." (*Id.* at p. 145.)

In determining a defendant's guilt, "[e]vidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).) Such evidence is inadmissible "to show or negate the *capacity* to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act." (*Ibid.,* italics added.) "Whether mental disease or defect prevented the defendant from understanding the nature and quality of the criminal act, or appreciating its wrongfulness, are questions relevant only at a sanity trial." (*Elmore*, *supra,* 59 Cal.4th at p. 141.)

Here, there is overwhelming evidence that defendant acted with express malice when he shot and killed Tiffany. "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*People v. Smith*, *supra,* 37 Cal.4th at p. 742.) Here, it is undisputed that defendant shot Tiffany in the back of the head at close range. During his interview with detectives, defendant stated that he was six to eight feet away from Tiffany when he shot her. Such evidence is sufficient to support an inference defendant acted with express malice.

20

There likewise is sufficient evidence that the murder was deliberate and premeditated. The evidence showed that defendant was angry with Tiffany when he shot her on the morning of February 13, 2011. He was frustrated that she was not helping out around the house and brought marijuana into the house the night before, and his frustration grew when she refused to heed his commands that morning. She refused to remain seated on the coach, eluded his attempt to restrain her, and eventually got into a physical altercation with him. When he struck her on the head with the gun, she directed S. to call 911. S. was shot as she made the call, further frustrating defendant and causing S. to flee out the front door. Seconds later, defendant shot Tiffany at close range in the back of the head.

Applying the *Anderson* guidelines, we find evidence of planning (defendant's arming himself, and procuring the rope and chair), motive (vengeance and/or a desire to control Tiffany), and a manner of killing indicative of a deliberate intent to kill (firing a shot at a vital area of the body at close range). These facts suffice to support a verdict of premeditated and deliberate first degree murder.

Defendant complains that the trial court ignored evidence that his actions were impulsive. In particular, he relies on the opinions of Drs. Soulier and Schaffer. Dr. Soulier opined that while defendant had the capacity to act in a considerate, calculating, and controlled way at the time of the shooting, he also stated that the shooting "was carried out fairly impulsively. It was a night of frenzy," "psychosis," and "agitation." Later, when asked whether he would have expected defendant to state that he intentionally shot Tiffany because he was afraid she had a bomb if that was indeed the reason he shot her, Dr. Soulier responded, "Well, again, it wasn't so rationally and logically thought out. That's, again, why I return to the word, impulsive."

Dr. Schaffer opined that defendant lacked the capacity to act in a considered, calculated, and controlled way when he shot Tiffany, explaining: "I believe that it was an impulsive act, as she was walking out the door. . . . In other words, I asked myself in the

21

absence of her walking out the door, would he have shot her?  I would say a good chance he wouldn't have if she had listened to him."

First, the trial court was not required to blindly accept the doctors' opinions.  As the trier of fact, it was the court's duty to evaluate the doctors' opinions, examine the bases for the opinions, and determine whom to believe.  (See *People v. Chavez* (2008) 160 Cal.App.4th 882, 891 (*Chavez*).)  Dr. Soulier appears to have based his opinion that defendant acted "fairly impulsively" on his conclusion that the shooting was not thought out.  Dr. Schaffer appears to have based his opinion that the shooting was an impulsive act on his finding that defendant did not decide to shoot Tiffany until she was walking out the door.  The trial court reasonably could have concluded that the grounds upon which the doctors based their opinions did not support a finding that the shooting was impulsive such that it was not premeditated and deliberate.  Even assuming that the shooting was not thought out and that defendant did not decide to kill Tiffany until she attempted to walk out the door, the trial court reasonably could conclude the shooting was premeditated and deliberate.

" 'Premeditation and deliberation can occur in a brief interval.  "The test is not time, but reflection.  'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " '  [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 697.)  Here, the trial court found that defendant did not decide to kill Tiffany "until the point where she is going out the door" but concluded that at that moment he considered whether or not to do so, citing defendant's statements that he was angry, could not get Tiffany to talk to him, and he was afraid she would leave and never return, leaving him to care for the twins.  As detailed above, that conclusion that the shooting was premeditated and deliberate is supported by sufficient evidence.  (*Ante,* at p. 21.)

In sum, defendant's first degree murder conviction is supported by substantial evidence.

## III
### The Trial Court's Sanity Determination Is Supported by Substantial Evidence

Finally, defendant claims that "[t]he preponderance of the evidence demonstrated [he] was insane as a matter of law." He argues that it was undisputed that he was "suffering from a severe psychotic disorder at the time of the crime," and that the trial court "arbitrarily disregarded the experts' conclusions." As we shall explain, the trial court's sanity determination is supported by substantial evidence.

In California, the test for insanity is whether the defendant was unable either to understand the nature and quality of the criminal act or to distinguish right from wrong when the act was committed. (§ 25, subd. (b); *Elmore*, *supra*, 59 Cal.4th 121, 140; *People v. DeHoyos* (2013) 57 Cal.4th 79, 118; CALCRIM No. 3450.) This standard rests upon the decision in *M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722, and is referred to as the *M'Naghten* test. (*Elmore*, at p. 140.) In determining the issue of sanity, the trier of fact evaluates the expert opinions, examines the bases for the opinions, and determines whom to believe. (*Chavez*, *supra*, 160 Cal.App.4th at p. 891.) The defendant bears the burden of proving by a preponderance of the evidence that he was legally insane when he committed the crime. (§ 25, subd. (b); *People v. Mills* (2012) 55 Cal.4th 663, 672 (*Mills*).) "Notably, a defendant may suffer from a diagnosable mental illness without being legally insane under [California law]." (*Mills*, at p. 672.)

We review the trial court's sanity determination for substantial evidence. (*Chavez, supra,* 160 Cal.App.4th at p. 891.)

Each of the doctors who opined on defendant's mental state at the time of the shootings agreed that defendant was suffering from a mental disorder at the time of the shootings but nevertheless found he was able to understand the nature and quality of his acts. They disagreed, however, on his ability to distinguish the moral rightness or wrongness of his acts. While Drs. Soulier and Shaffer opined that defendant lacked the ability to make such a distinction, at least with respect to the shooting of Tiffany, Dr.

23

Foster opined that defendant was capable of understanding that his acts were both legally and morally wrong.

The trial court rejected Drs. Soulier and Schaffer's opinions that defendant did not understand that shooting Tiffany was morally wrong because he believed he had do so to save himself and his children, finding their opinions were not supported by the material upon which they relied, in particular defendant's history and statements concerning his state of mind at the time of the shooting. The court acknowledged defendant's fears regarding a bomb but found those fears were not new, and thus, rejected the notion that they were the impetus behind the shooting. Instead, the court found that defendant shot Tiffany because of his profound disappointment with her, which he understood was morally wrong. Contrary to defendant's assertion, the trial court's rejection of Drs. Soulier and Schaffer's opinions on this issue was not arbitrary. This is not a case where the reasoning and the material on which the doctors based their opinions were of such weight and character that the trial court could not reasonably reject them. (*People v. Drew* (1978) 22 Cal.3d 333, 350-351, superseded by statute on another ground in *People v. Skinner* (1985) 39 Cal.3d 765, 768-769 (*Drew*).)

Having found the trial court properly rejected defendant's evidence, we need not consider the prosecution's evidence, namely the testimony of Dr. Foster. Defendant has the burden of proof on the issue of insanity. (§ 25; *Mills, supra,* 55 Cal.4th at p. 672.) Having concluded defendant failed to meet that burden, the trial court was required to find him sane. (See *Drew, supra,* 22 Cal.3d at p. 351 ["[I]f neither party presents credible evidence on [the issue of insanity], the [trier of fact] must find him sane."].)[4]

_____

[4] To the extent defendant challenges the trial court's finding that defendant understood the moral wrongness of shooting S., the challenge fails. Defendant's own expert, Dr. Schaffer, opined that defendant had the capacity to distinguish the moral rightness or wrongness of his act when he shot S.

24

DISPOSITION

The judgment is affirmed.

_____/s/_____
Blease, Acting P. J.

We concur:

_____/s/_____
Mauro, J.

_____/s/_____
Renner, J.