Filed 9/20/16  P. v. Briles CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067998 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE321499) |
| DOUGLAS ANDREW BRILES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel G. Goldstein, Judge.  Affirmed.

Marilee Marshall & Associates and Marilee Marshall for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Rami Falkenstein Hennick and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent

Douglas Andrew Briles pled guilty and not guilty by reason of insanity to an amended information charging him with attempted murder (Pen. Code, §§ 187, subd. (a), 664),[1] making a criminal threat (§ 422) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)). Briles also admitted that he incurred a prior conviction constituting both a prior strike (§§ 667, subds. (b)-(i), 1170.12) and a prior serious felony (§§ 667, subd. (a)(1), 1192.7, subd. (c)). Briles waived his right to a jury trial for the sanity trial, and the trial court found that Briles was legally sane during the commission of the crimes. The trial court denied Briles's motion to strike his prior strike and sentenced Briles to prison for a term of 15 years, with a recommendation that Briles be housed in a state mental hospital.

Briles contends that the trial court's sanity finding is not supported by substantial evidence because the record does not support a finding that Briles was capable of understanding that the acts he committed were morally wrong. Briles also contends that the trial court abused its discretion in declining to strike his prior strike. We conclude that Briles's arguments lack merit, and we accordingly affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. *Briles's Attack on Masikip*

In 2012, Briles, who was born in 1961, had been residing at a board and care facility in El Cajon for approximately 14 years. Briles was diagnosed with paranoid

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

schizophrenia in his early 20's and until shortly before the incident at issue in this case, Briles was being treated with injections of medication. Briles's normal medication was discontinued, and he was switched to an oral medication, which he stopped taking. As a result, Briles's psychiatric symptoms worsened, leading to an emergency psychiatric hospitalization on May 24, 2012, from which he was released on June 4, 2012.

On the morning of June 13, 2012, the manager of the board and care facility, Leonora Masikip, was in the kitchen and heard Briles creating a disturbance in the living room.[2] Masikip attempted to lock the kitchen door, but Briles kicked through it, and Masikip fled from the kitchen into an office in a separate building. Witnesses heard Briles say, "I will kill you" as he chased after Masikip. Briles kicked open the office door, and then approached Masikip and squeezed her neck with his hands. Briles and Masikip fell to the ground as Briles continued squeezing, and Masikip stated, "Doug, please stop." Staff workers attempted to pull Briles off Masikip but were unsuccessful.

Police officers responded to a 911 call and observed Briles still squeezing Masikip's neck. After struggling with Briles for two or three minutes, the officers were able to pull Briles off Masikip and handcuff him. Masikip did not suffer any serious injuries.

Immediately after the incident, Briles was taken to the emergency room, where he told doctors that Masikip made him mad and that he wanted to kill her " 'because she is

---

[2]    Our description of Briles's attack on Masikip and his subsequent statements to medical personnel and police is based on the agreed-upon recitation of the facts given by counsel at the beginning of the sanity trial.

stupid.' " A police officer then advised Briles of his *Miranda*[3] rights and asked if he wished to speak with the police, to which Briles replied, "I think I already said too much to get myself into trouble." When transported to jail, Briles told the intake nurse, "I got hurt" and explained that "I tried to kill somebody."

B.     *Trial Court Proceedings*

Briles was initially charged shortly after the incident, but proceedings were suspended in July 2012 for an investigation into Briles's mental competency. In February 2013, Briles was found mentally incompetent to stand trial and was ordered to be committed to a state mental hospital. In September 2013, the court found that Briles's mental competency had been restored.

In February 2014, an amended information charged Briles with attempted murder (§§ 187, subd. (a), 664), making a criminal threat (§ 422) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)), with the further allegation that Briles incurred a prior conviction constituting a prior strike (§§ 667, subds. (b)-(i), 1170.12) and a prior serious felony (§§ 667, subd. (a)(1), 1192.7, subd. (c)).

After another suspension of proceedings to investigate Briles's mental competency, the trial court made a second finding that Briles was mentally competent to stand trial on September 10, 2014. On January 26, 2015, Briles entered a plea of guilty and not guilty by reason of insanity to each of the charges against him and admitted his

---

3      *Miranda v. Arizona* (1966) 384 U.S. 436.

4

prior conviction. Briles waived his right to a jury trial on the issue of sanity and agreed that a finding on the sanity issue could be made by the trial court.

At the sanity trial, the evidence consisted primarily of the testimony by three expert witnesses, each of whom had interviewed and evaluated Briles for the purpose of opining on whether Briles was legally sane at the time he attacked Masikip.

1.     *Opinion of Stacey Berardino*

Psychologist Stacey Berardino was appointed by the trial court to examine Briles for the purpose of determining whether he was legally sane at the time of the offenses. Berardino testified that based on her interview of Briles on July 17, 2014, her review of certain relevant file materials and her administration of psychological tests to Briles, she reached the conclusion that at the time Briles attacked Masikip, he was capable of understanding the nature and quality of his act and he understood that his act was morally and legally wrong.

Berardino's opinion was based in part on certain statements that Briles made during the interview. At counsel's request, the trial court listened to the entirety of Berardino's interview with Briles.[4] As Briles explained the incident to Berardino, he heard Masikip and her cousin at the door to his room stating that he "can't have the fly," which he believed referred to taking away his marijuana. Briles stated that he "started going off" and he kicked in three doors and ran after Masikip. Briles explained that "[n]ext thing you know, I'm on the floor with my hands around [Masikip's] neck." Briles

---

[4]    The parties have provided a transcript of the interview for the appellate record, which we have reviewed as part of our analysis.

told Berardino, "I almost choked her to death. I did. Oh, I'm so glad she didn't die. . . . [T]his lady, I didn't have anything against her in the world. . . . And I didn't mean to do it, assault that lady. . . . And that was a terrible thing." Briles commented, "[T]he police got involved, thank God."

In response to several questions by Berardino about why he attacked Masikip, Briles stated that he did not know why he did it and did not know what he was thinking at the time. He also commented, "I wasn't thinking anything at all." At one point Briles speculated, "I think in the back of my mind, really, this is what I had to do to get out of there" as "people there [in the board and care facility] would drive me out of my mind."

In trying to explain why he attacked Masikip, Briles also made broad statements to Berardino indicating that God must have wanted him to act as he did. Briles stated several times that he was the Messiah and made statements such as, "God is somehow inside of me. God is directing my whole life. I'm not responsible for anything I'm doing because there's something more God wants me to do," and that there was no avoiding the attack because "this is God's plan."

Berardino directly asked Briles, "Do you think choking [Masikip] was wrong?" Briles answered "Yes," and explained "She's . . . just a nice lady." Berardino then asked "Did you think it was wrong *then* to choke [Masikip]?" (Italics added.) Briles stated, "It has never been right to choke [Masikip]."

In addition to relying on the content of her interview with Briles, Berardino reached the conclusion that Briles understood that the acts were morally wrong based on Briles's statement to police that he had already said too much and should stop talking

6

about it.  She also noted that the attack on Masikip was consistent with Briles's history of impulsive aggressive behavior when there is something he wants and that he becomes angry and aggressive when off of his medication.  Although Berardino acknowledged that Briles was suffering from a mental illness at the time of the incident and showed some evidence of delusional thinking during the interview, including recurring delusions about a woman named Lucy, his future in Hollywood, and God's plans for him, she nevertheless concluded that Briles was capable of understanding the nature or quality of his acts and of understanding that they were wrong.

    2.    *Opinion of Dr. Sanjay Rao*

Psychiatrist Sanjay Rao was also appointed by the trial court to examine Briles for the purposes of the sanity trial.  Rao interviewed Briles on May 9, 2014, and also reviewed certain relevant records.  Rao concluded that Briles was schizophrenic, but at the time of the attack on Masikip, Briles was capable of knowing and understanding the nature and quality of his acts, and was capable of knowing that his acts were morally and legally wrong.  Rao based his opinion, in part, on statements that Briles made during their interview.  As Rao testified, Briles described the incident as being precipitated by the fact that Masikip was "bugging" him, that he felt like he was possessed by Satan during the act, and that "what he did was a terrible thing."  Rao asked Briles if he knew what he was doing was wrong before he started choking Masikip.  Briles stated, "Yeah, of course you're not supposed to harm anybody."

Rao also based his opinion on (1) Briles's statement to police that he had already said too much to get himself in trouble; and (2) Briles's statements after the event that

7

Masikip was "stupid" and made him mad, which showed that Briles was experiencing a stressor from a dispute with Masikip. Rao explained that he did not see any evidence of an active psychotic process during the incident that would have clouded Briles's understanding of right and wrong.

3.      *Opinion of Clark Clipson*

Psychologist Clark Clipson, who was called by Briles as an expert witness, interviewed Briles on December 13, 2013, reviewed relevant records, and conducted psychological testing. According to Clipson, Briles made the following statement about the incident: "I ran after her and choked her. I thought she was an alien and I thought if I didn't kill her, she would torture me and Lucy forever because of some sort of experiment that had gone wrong," and "I thought God and aliens were coming to get me." Clipson explained that for approximately 30 years Briles was preoccupied with and engaged in delusional thinking about a woman named Lucy. In Briles's delusional thinking, he believes that he and Lucy are supposed to be together and he is constantly looking for her, but he believes that other people get in the way of him being with Lucy.

Clipson concluded that while attacking Masikip, Briles understood the nature and quality of his acts and understood that they were *legally* wrong. However, according to Clipson, Briles did not understand that what he was doing was *morally* wrong. As Clipson explained, Briles did not understand the attack on Masikip was morally wrong because "he . . . thought if he didn't kill Ms. Masikip, that he and Lucy were going to be tortured" and thus he "had no choice but to kill her in order to prevent being tortured." Clipson acknowledged that Briles made no mention of aliens or Lucy around the time of

8

the attack, but explained that the different statements that Briles gave about the incident were "a reflection of the way delusional material seems to sort of morph in people's minds from time to time."

C.    *The Trial Court's Finding and Sentencing Decision*

The trial court found that Briles was legally sane at the time he attacked Masikip. The trial court concluded that Briles understood the nature and the quality of his acts, and understood that they were legally and morally wrong. Responding to defense counsel's argument that Briles believed his acts to be morally justified because God directed him to commit them, the trial court explained that although Briles gave different explanations for his actions to the three different interviewers, the most probative statements were those that he made around the time of the incident, in which he made no statements about committing the attack based on any direction from God or Satan. The trial court also pointed out that in his statements to Berardino, Briles did not make a direct nexus between God and the attack, as he did not state that God *told* him to do the act, and appeared to be discussing God's plan for him as a way to understand *in retrospect* why he committed morally indefensible acts. As the trial court emphasized, Briles told Berardino that he " 'wasn't thinking of anything' " during the attack.

After the conclusion of the sanity phase of the proceedings, Briles filed a motion to strike his prior strike, which the trial court denied. The trial court then sentenced Briles to prison for a term of 15 years, with a recommendation that Briles be housed in a state mental hospital.

9

II

DISCUSSION

A.    *Briles's Challenge to the Sanity Finding*

Briles's first argument on appeal is that insufficient evidence supports the trial court's finding that he was capable of understanding that his acts were morally wrong at the time he committed them.

1.    *Applicable Legal Principles*

We begin by reviewing the legal principles applicable to a defendant who pleads not guilty by reason of insanity.  "It is fundamental to our system of jurisprudence that a person cannot be convicted for acts performed while insane."  (*People v. Kelly* (1973) 10 Cal.3d 565, 574.)  Under California law, "insanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed."  (*People v. Elmore* (2014) 59 Cal.4th 121, 140; see also § 25, subd. (b).)  "Notably, a defendant may suffer from a diagnosable mental illness without being legally insane."  (*People v. Mills* (2012) 55 Cal.4th 663, 672.)

When a defendant pleads not guilty by reason of insanity, "the burden is upon the defendant to prove by a preponderance of the evidence that he was insane at the time of the offense."  (*People v. Hernandez* (2000) 22 Cal.4th 512, 521.)

On appeal, our role is to determine whether the trial court's sanity determination is supported by substantial evidence.  (*People v. Chavez* (2008) 160 Cal.App.4th 882, 891 (*Chavez*).)  Under that standard, we view the evidence in the light most favorable to the

10

trial court's finding and presume in support of the judgment the existence of every fact the trial court could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) In its role as trier of fact, "[i]t was for the [trial court] to evaluate the testimony of the experts, examine the bases for their opinions and determine whom to believe." (*Chavez*, at p. 891.)

When determining whether a defendant was capable of distinguishing right from wrong, the question is "whether a defendant can distinguish, not the legal rightness or wrongness of his act, but its moral rightness or wrongness." (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1272 (*Stress*).) "Thus, if a person is incapable, because of a mental disease or defect, of understanding that his actions are morally wrong — that is, in violation of generally accepted standards of moral obligation — then that person is legally insane, regardless of whether he knows his actions are illegal." (*People v. Severance* (2006) 138 Cal.App.4th 305, 323; see also *People v. Skinner* (1985) 39 Cal.3d 765, 783 (*Skinner*) ["a defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful"].) "While . . . in most instances legal wrongfulness and moral wrongfulness are equivalent, this is not always the case [citations] and a defendant is free to argue . . . that while he was able to distinguish between legal right and wrong he could not distinguish between moral right and wrong." (*Stress*, at p. 1275.)

Further, morality in the context of the insanity defense means generally accepted moral standards, and not the defendant's " 'own distorted standards.' " (*People v. Coddington* (2000) 23 Cal.4th 529, 608-609.) Thus, a "defendant is sane if he knows his

11

act violates generally accepted standards of moral obligation whatever his own moral evaluation may be." (*Stress*, *supra*, 205 Cal.App.3d at p. 1274.)

Here, Briles does not dispute that the evidence shows that he was capable of understanding the nature and quality of his acts and understood that they were *legally* wrong, as each of the three experts agreed on those facts. However, Briles contends that insufficient evidence supports a finding that he was capable of understanding that his acts were *morally* wrong. We accordingly turn to an analysis of that issue.

> 2. *Substantial Evidence Supports a Finding That Briles Understood His Acts Were Morally Wrong*

Briles contends that the only reasonable conclusion that the trial court could draw from the evidence is that Briles was suffering from delusions during his attack on Masikip which made it impossible for him to understand that his actions were morally wrong. However, as we will explain, Briles's argument lacks merit because ample evidence in the record — upon which the trial court reasonably could decide to rely — supports a finding that Briles was not suffering from delusions that impacted his ability to understand the wrongfulness of his acts.

As Briles points out, the record contains evidence of two types of delusional thinking that could have caused Briles to attack Masikip: (1) as Briles described to Clipson, he believed Masikip was an alien who planned to torture him and Lucy; and (2) as Briles described to Berardino, he believed that it was God's plan for him to attack Masikip. We discuss each in turn.

12

a.      *Delusion That Masikip Was an Alien*

First, as we have described, based on Briles's statement that he attacked Masikip because she was an alien who would torture him and Lucy, Clipson reached the conclusion that Briles thought it was morally justifiable to attack Masikip in self-defense. Briles argues that "it was unreasonable for the court not to credit . . . Clipson's more thorough evaluation and find that [Briles] was insane at the time of the attack." We disagree because, as we will explain, the trial court reasonably could conclude that Briles's statement that he believed Masikip to be an alien was not credible.

As the trial court pointed out, Briles gave different accounts of his motivations to Clipson, Berardino and Rao. Only when speaking to Clipson did Briles mention a belief that Masikip was an alien. Indeed, casting doubt on the veracity of Briles's statement to Clipson about believing Masikip to be an alien, we note that during Briles's interview with Berardino, when she asked Briles why he attacked Masikip, Briles acknowledged that he could choose to make up a story about aliens, but that he knew Berardino would "see through" that story.[5] Further, as the trial court reasonably concluded, the statements that Briles made immediately after the attack were more probative of Briles's motivations for attacking Masikip than the statements that he made to mental health professionals many months later. Therefore, the trial court reasonably could conclude that, according to what Briles stated immediately after the attack, he was motivated to attack Masikip

---

[5]      Specifically, Briles stated, "You know, that's what people say when they — when they go into a hospital or, say, jail, they say something like, Oh, aliens — yeah, they say, Just talk about aliens man, you know. And you guys — you guys know it. You can see right through it when they start talking about aliens."

13

because he thought she was "stupid" and she made him mad, not because he believed Masikip was an alien from whom he had to defend himself.

As the finder of fact, the trial court was entitled to weigh, evaluate and reject Clipson's opinion that Briles was motivated by a delusional belief that Masikip was an alien that caused him to think his actions were morally justified, and rely instead on Rao's and Berardino's opinions that Briles understood the attack on Masikip was morally wrong. Rao's and Berardino's opinions provided substantial evidence to support the trial court's finding. (See *People v. Wolff* (1964) 61 Cal.2d 795, 804 ["if there is substantial evidence from which the jury could infer that the defendant was legally sane at the time of the offense such a finding must be sustained in the face of any conflicting evidence, expert or otherwise, for the question of weighing that evidence and resolving that conflict 'is a question of fact for the jury's determination' "]; *Chavez*, *supra*, 160 Cal.App.4th at p. 891 [jury may reject expert opinion on insanity unless defendant demonstrates it "was of such weight that the jury could not reasonably reject it"].)

   b.   *Delusion About God's Plan*

Second, although Briles directly told both Berardino and Rao that he knew it was morally wrong to choke Masikip at the time he was committing the act, Briles contends that the trial court should not have relied on those statements or credited Berardino's and Rao's opinions, because Briles told Berardino that he attacked Masikip as part of God's plan for him. As he did in the trial court, Briles argues that because he believed it was God's plan for him to attack Masikip, the evidence shows that he believed that it was

14

morally permissible for him to commit that act. As we will explain, the trial court reasonably rejected that interpretation of the evidence.

As the trial court pointed out, Briles did not state that God ever told him it was morally permissible to attack Masikip during the attack. Indeed, Briles stated that he was not thinking anything at all during the attack, and he did not know why he did it. Instead, Briles's discussion of God's plan and his belief that he was the Messiah appears to be Briles's retrospective attempt to make sense of the behavioral compulsion that he felt during the attack, which he believed did not "make sense logically" as Masikip was "just a nice lady."

Briles argues that this case is like *Skinner*, *supra*, 39 Cal.3d 765, which held that the evidence was sufficient to show that the defendant was incapable of understanding that the killing of his wife was morally wrong. In that case, the defendant acted under the belief that God morally sanctioned the killing of a spouse who violates marital vows. (*Skinner*, at pp. 770, 784.) This case is not like *Skinner*. The record contains no indication that Briles believed that God morally sanctioned his attack on Masikip. Instead, Briles consistently stated that he believed that the attack on Masikip was morally wrong and never indicated that God gave him moral permission to act as he did.[6]

---

6      Briles also relies on *Stress*, *supra*, 205 Cal.App.3d 1259, which held that the evidence could be interpreted to support a finding that the defendant was legally insane when he killed his wife because he was suffering from a delusion that made it morally permissible to do whatever was necessary to bring attention to a conspiracy that he believed existed and thus "contribute to some higher good." (*Id*. at pp. 1263, 1275.) *Stress* is not applicable here because there is no evidence that Briles believed at the time

15

In sum, based on the evidence at trial, the trial court reasonably could reject Briles's argument that he was suffering from a delusion that caused him to believe that it was morally acceptable to attack Masikip, and it could instead reasonably credit Berardino's and Rao's expert opinions and Briles's own statements that established Briles was capable of understanding that it was morally wrong to attack Masikip at the time that he acted. Accordingly, the sanity finding is supported by substantial evidence.

B.    *The Trial Court Did Not Err in Declining to Strike the Prior Strike*

We next consider Briles's contention that the trial court erred in declining to strike his prior strike.

Briles suffered a prior strike in Oregon in 1985, when he was convicted of first degree arson. As reflected in the probation officer's report and the People's sentencing memorandum, Briles committed the arson in 1984 when he broke into the residence of a professor, on whose property he had been living, and burned down the residence after attacking the professor and stating he would kill him. Briles was sentenced to a 20-year prison term, but was paroled in 1988.

At sentencing, defense counsel argued that the trial court should exercise its discretion to strike the prior strike, because the 1984 arson was remote in time, Briles did not have an extensive criminal history, he had been able to conduct himself as a law abiding citizen, and the current offense was precipitated by mental illness.

---

that he attacked Masikip that he was acting to contribute to some higher good, and Briles specifically stated that he was not thinking anything while committing the attack.

16

A trial court may dismiss prior felony conviction allegations in cases prosecuted under the Three Strikes law when dismissal is "in furtherance of justice." (§ 1385, subd. (a); see *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530.) "[T]he law creates a strong presumption that any sentence that conforms to [its] sentencing norms is both rational and proper." (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*).) In deciding whether to dismiss prior conviction allegations, the court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

We review a trial court's refusal to strike prior conviction allegations for abuse of discretion. (*Carmony*, *supra*, 33 Cal.4th at p. 375.) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

Here, the trial court explained its decision to deny the motion to strike Briles's prior strike on the basis that even though the arson conviction was remote, it was a "horrendous" crime that could have resulted in death or great bodily harm. Moreover, the trial court noted that although the arson conviction was remote, Briles had not remained law abiding in the interim, as he committed misdemeanor offenses, which included a

17

threat to burn down somebody's house,[7] showing that Briles continued to engage in violent conduct.

We conclude that the trial court did not abuse its discretion in determining that Briles fell within the spirit of the Three Strikes law. Although the arson conviction could be viewed as remote, remoteness supports striking a prior felony conviction only when there has been "a crime-free cleansing period of rehabilitation after a defendant has had the opportunity to reflect upon the error of his or her ways." (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813.) Although Briles's arson offense occurred in 1984, he did not remain largely law abiding since that time. As the trial court pointed out, Briles incurred two misdemeanor convictions showing that he continued to have a propensity to engage in violent conduct toward others. Further, as the trial court observed, both the arson and the instant offense were serious violent crimes, as Briles attempted to kill the victims in both cases, showing that Briles's criminal dangerousness that existed at the time of the 1984 arson is still present.

On this record, where the trial court considered the relevant criteria, including the serious and violent nature of Briles's prior strike and the present offense, as well as Briles's additional criminal history, we find no abuse of discretion in the trial court's refusal to strike Briles's prior strike.

---

7    In 1994, Briles incurred a misdemeanor conviction for making a criminal threat when he escaped from a locked convalescent hospital and telephoned his mother and stepfather, threatening to burn down their residence when they refused his request for money. In 1997, Briles was convicted of assault on a peace officer when he refused deputies' orders to leave a courthouse and physically struggled with them.

18

DISPOSITION

The judgment is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.